In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3174

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADAM WILLIAMS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:08-cr-43—**James T. Moody**, *Judge.*

ARGUED MAY 18, 2010—DECIDED AUGUST 5, 2010

Before O'CONNOR,[1] *Associate Justice*, and KANNE and
ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Appellant Adam Williams
appeals his conviction for illegal possession of a firearm
and various drug distribution offenses. He argues that

---

[1] The Honorable Sandra Day O'Connor, Associate Justice
(Retired) of the United States Supreme Court, sitting by des-
ignation.

(1) the district court's failure to inquire into his concerns over his attorney's performance was an abuse of discretion; (2) the statute dispossessing felons of firearms, 18 U.S.C. § 922(g)(1), is unconstitutional; and (3) the district court's assessment of the sentencing factors in 18 U.S.C. § 3553(a) was inadequate. We affirm.

## I. BACKGROUND

As part of a narcotics investigation, in early 2008 the Hammond, Indiana Police Department enlisted the help of a confidential informant ("CI") in making controlled purchases of crack cocaine and marijuana from Appellant Adam Williams. On three separate occasions, the CI, wearing audio and video recording devices, purchased narcotics from Williams. Based on this electronic surveillance, Hammond police officers obtained a search warrant for Williams's house.

In April 2008, officers arrived at Williams's home to execute the warrant. After knocking on the door to announce their presence and receiving no answer from within, the officers broke down the door. As one of the officers entered, he saw Williams approaching with a handgun pointed toward the doorway. As the other officers entered the house, Williams retreated to his bedroom and placed the gun on the ground a few inches from him. The officers then arrested Williams without incident.

The day after his arrest, federal agents from the Bureau of Alcohol, Tobacco, and Firearms went to the

Hammond city jail to question Williams. After receiving his Miranda rights, Williams explained to agents that when the officers had arrived to execute the warrant, he believed that someone was breaking into his house in an attempt to rob him, which is why he had retrieved the gun from under his bed. He then proceeded to make various inculpatory statements during a video-taped interview. For example, Williams confessed to selling crack, but not marijuana (he claimed that he possessed the latter only for personal use). He told agents that he had been earning approximately $150 per week through his crack sales. Williams also made incriminatory statements about the use to which he put drug paraphernalia found at his home; he explained that he used rubber gloves when he was bagging drugs to keep the drugs out of his system.

Williams subsequently stood trial by jury. At trial, Williams testified in his own defense. He claimed never to have sold crack or marijuana to the CI despite his earlier confession to the contrary. Instead, he claimed that he and the CI had pooled their resources to purchase shared drugs from another dealer named "Casino." He also explained that his statement that he had been earning $150 each week from crack sales was "misunderstood" by federal agents. Rather, he claimed that he had bought the crack to use as Christmas party favors, and after changing his mind, tried to recoup his expenses by selling the crack. He also tried to negate his inculpatory statement regarding the drug paraphernalia by explaining that it belonged to Casino, who did not live with Williams, but sometimes bagged his drugs in

Williams's home. Finally, Williams testified that the handgun did not belong to him, but to his sister, who left it with him to use for his protection.

On the second day of trial, during the government's case-in-chief, Williams asked to speak to the judge outside of the jury's presence. Williams explained to the trial judge that he had not seen one of the video recordings until it was played by the prosecution, despite his request to review all of the video and audio recordings prior to trial.[2] The following exchange occurred:

| The Court: | Okay. . . . Counsel, are both of you ready to go? |
|---|---|
| [AUSA] Lanter: | Yes. |
| Williams: | Your Honor, can I speak? |
| The Court: | What do you want? |
| Williams: | I feel that I would like for you to read this. |
| The Court: | Why? Look, we are in the middle of a trial, sir. |
| Williams: | Yes, sir. I understand. There's some things that has [sic] occurred in my case that I feel did not come out between me |

---

[2] Two weeks prior to trial, Williams had written his attorney, asking his attorney to perform a video analysis of the CI's recordings. The record does not specify what this analysis would entail or whether this analysis was ever completed.

|            | and my lawyer. I did not see the video of 3/25 until yesterday when it was shown to the jury, and I had requested to see all the audio, all the video. |
|------------|------------|
| The Court: | Look, you have a lawyer. He's a very professional individual. You are not— |
| Williams:  | This is correct. |
| The Court: | —trying this case on your own and you can't do that. |
| Williams:  | Yes, sir. I understand. |
| The Court: | So that's just between you and him, sir. |
| Williams:  | That's the point I'm trying to make. I feel like my lawyer has failed me. |
| The Court: | Not yet. Too late. We're in the middle of a trial. We are going to go forward. I don't care—at this stage, I really don't care what you think. You got it? |
| Williams:  | Yes, sir. |
| The Court: | Good. Get the jury in. |

(App. at 8-9.) Williams expressed no further concerns after this exchange, and did not move for a new trial.

The jury acquitted Williams on one count of marijuana distribution and one count of possessing a firearm

in furtherance of drug trafficking. But the jury found Williams guilty on one count of distributing marijuana, two counts of distributing cocaine base, one count of possessing with intent to distribute crack cocaine, and one count of possessing a firearm as a felon. Williams now appeals his conviction.

## II. ANALYSIS

### A. Sixth Amendment Right to Counsel

Williams first contends that the district court abused its discretion by declining to inquire further into Williams's expressed concerns over his attorney's performance. We held in *United States v. Zillges* that "[w]hen, for the first time, an accused makes known to the court in some way that he has a complaint about his attorney, the court must rule on the matter." 978 F.2d 369, 371 (7th Cir. 1992). If the accused expresses the reasons for his concerns to the court, "the court may rule without more." *Id.* But if the accused does not state the reasons for his concerns, "the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known." *Id.* at 372; *see also United States v. Morris*, 714 F.2d 669, 673 (7th Cir. 1983).

*Zillges*, however, involved a defendant's express request for the appointment of new counsel. 978 F.2d at 371. Williams was not requesting a new attorney, but simply was expressing concerns over his current attorney. We have not yet had occasion to expound on

*Zillges*'s application in the latter situation. Today, we do. We think that the reasoning in *Zillges* applies with equal force regardless of whether a complaint is phrased in terms of an express motion for a new attorney or simply in terms of dissatisfaction with one's current attorney.

The government admits that when construed liberally, Williams's comments lend themselves to the possibility that he was either requesting a new attorney or the permission to proceed pro se. The government therefore admits that the court should have inquired further into Williams's concerns instead of abruptly silencing him.

We agree. The district court declined to use the opportunity to inquire fully into Williams's perceived problems with his attorney. The district court's dismissal of Williams's concerns was an abuse of discretion, and served to stifle what may have been legitimate concerns that Williams had about his attorney's performance.

Because we have never addressed a situation where a district court did not inquire into a defendant's concerns with his current attorney, we also have not had occasion to determine the effect of an abuse of discretion in those circumstances. We now hold that the district court's abuse of discretion will only result in a new trial if Williams can show prejudice. If not, then any error was harmless.

In *Zillges*, we analogized to *Strickland v. Washington*, 466 U.S. 668 (1984), in reaching our determination that "a district court's failure to conduct a sufficient inquiry into a substitution motion does not constitute reversible

error unless it result[s] in a denial of this Sixth Amendment right." 978 F.2d at 372. We thus determined that a failure to inquire was not a structural error requiring automatic reversal, but instead, was subject to the harmless error standard. *Id.* at 372-73. To prevail, the defendant was required to "demonstrate that the performance of his attorney was not within the range of competence demanded of attorneys in criminal cases, and that but for counsel's deficiencies, the result of the proceeding would have been different." *Id.* (*citing Strickland*, 466 U.S. at 687, 694) (internal quotation marks omitted).

*Zillges* and *Strickland* guide our decision in this case. If a defendant who makes an express motion for substitute counsel must show prejudice to prevail on a district court's failure to inquire, then so too must a defendant who makes only an implicit motion.

Unfortunately for Williams, he is unable to satisfy *Strickland*'s burden. First, Williams is unable to show that his attorney's performance was incompetent. The only evidence he points to of incompetence is that his attorney did not review with him the video recordings prior to trial. And while standing alone this may potentially give rise to a possibility of deficient performance, when coupled with the actions that Williams's attorney *did* take, we cannot say that the attorney's performance was incompetent. For example, Williams's attorney knowledgeably questioned the witnesses, including Williams, about the recordings. During his closing argument, the attorney demonstrated his familiarity with the recordings, even commenting at one point about his ex-

tensive review of them. Because this evidence demonstrates Williams's attorney's preparation and review of the recordings, Williams has failed to show that his attorney's performance was deficient.

Second, even if Williams could demonstrate his attorney's incompetence, he is unable to establish a reasonable possibility that the results would have been different "but for" his attorney's allegedly deficient performance. We recognize that Williams was acquitted on one charge of marijuana distribution, so there is a small chance that the videos *may* have shown exculpatory evidence if Williams had the chance to review them prior to trial. But a remote possibility is different than the reasonable possibility required by *Strickland*. And the remote possibility presented here has even less significance in light of the fact that the other evidence of Williams's guilt is overwhelming.

For example, because the video recordings were consistent with the other evidence presented at trial, there is nothing to suggest that they were inauthentic. And even if Williams is not arguing that the videos were inauthentic, but only that the videos did not demonstrate his guilt, the other evidence presented is to the contrary. The CI gave testimony about the controlled purchases, and the police officers who supervised the purchases testified as well. The government also presented samples of the drugs the CI purchased from Williams, other physical evidence seized from Williams's house, and Williams's own videotaped inculpatory statements. Under these circumstances, we cannot say that

Williams demonstrated a reasonable possibility that he would have been acquitted but for his attorney's alleged deficiencies.

Because Williams cannot satisfy his burden under either prong of the *Strickland* standard, the district court's abuse of discretion was harmless. Therefore, his drug conviction will be affirmed.

### B.  Second Amendment Right to Firearm Possession

Williams next argues that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), is unconstitutional as applied to him. Prior to trial, Williams moved to dismiss the charge against him for being a felon in possession of a firearm. As support for his motion, he cited the Supreme Court's recent decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), and our panel opinion in *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *vacated and remanded*, No. 08-3770, 2010 WL 2735747 (7th Cir. July 13, 2010) (en banc). Based on *Heller*, Williams argued that the statute criminalizing his possession of a firearm as a convicted felon was unconstitutional because it infringed on his right to possess firearms for use in self-defense. The district court denied the motion, relying on *Heller*'s now-famous dictum that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." 128 S. Ct. at 2816-17. Williams appeals the denial of his motion. Reviewing *de novo* the district court's denial of Williams's

motion to dismiss the indictment, *United States v. Greve*, 490 F.3d 566, 570 (7th Cir. 2007), we affirm.

Williams argues that because the *Heller* Court determined that the "core" ideal the Second Amendment protects is self-defense, the statute criminalizing his possession of a firearm is unconstitutional as applied to him. 128 S. Ct. at 2817; *see also McDonald v. City of Chicago*, No. 08-1521, 2010 WL 2555188, at *22 (U.S. June 28, 2010) (plurality opinion). Using our panel opinion in *Skoien* as support, Williams argues that the *Heller* dictum relied on by the district court should not be given so much credence. *Skoien* involved a challenge to the prohibition on firearm possession by misdemeanants convicted of domestic violence under 18 U.S.C. § 922(g)(9). Williams proffers that the now-vacated analytical approach promulgated by the *Skoien* panel is the approach we should use in determining the scope of his rights.

That vacated opinion adopted a two-step approach to evaluate Second Amendment challenges. First, the panel determined that courts should examine whether the challenged conduct falls within the scope of the Second Amendment's protection in the first instance. If not, the challenged regulation is valid. If so, then the court must move on to step two, which requires courts to apply some level of "means-ends" scrutiny to establish whether the regulation passes constitutional muster. 587 F.3d at 808-09.

Thereafter, *Skoien* was reheard en banc. Without deciding the question of whether those convicted of violent crimes were outside the scope of the Second

Amendment's protection at the founding, we deter-
mined in our en banc opinion that "some categorical
disqualifications [on firearm possession] are permissible."
*Skoien*, 2010 WL 2735747, at *3. To be permissible,
however, we held that categorical exclusions must
satisfy "some form of strong showing." *Id.* Finding that
§ 922(g)(9) satisfied this requisite "strong showing,"
we affirmed Skoien's conviction.

Because briefing and argument in Williams's case were
completed prior to the en banc argument in *Skoien*, Wil-
liams anticipated a potential reversal of *Skoien*'s panel
opinion, and so clarified in his reply brief that his argu-
ment was not dependent on our resolution of *Skoien*.
Rather, he argued that *Heller* standing alone supported
his as-applied challenge to § 922(g)(1). But we think that
the en banc decision in *Skoien* is instructive, especially
when read in conjunction with *Heller* and the Supreme
Court's most recent decision in *McDonald v. City of
Chicago*, 2010 WL 2555188.

In *Heller*, the Court stated that "[a]ssuming that Heller
*is not disqualified* from the exercise of Second Amend-
ment rights, the District must permit him to register
his handgun and must issue him a license to carry it in
the home." 128 S. Ct. at 2822 (emphasis added). This
language indicates that the threshold inquiry is whether
Williams is qualified to possess a firearm in the first
instance. In the *Skoien* en banc opinion, we implicitly
addressed this issue by beginning our analysis with a
reiteration of *Heller*'s idea that some categorical exclu-
sions of firearm possession are constitutional. 2010 WL

2735747, at *3. This notion was also recently affirmed by the Supreme Court in *McDonald*, where it "repeat[ed] [its] assurances" that *Heller*'s dictum regarding disqualifications on firearm possession by felons was valid. 2010 WL 2555188, at *25 (plurality opinion).

Based on these recent decisions and our reasoning in the *Skoien* en banc opinion, we need not address whether convicted felons fell outside the scope of the Second Amendment's protections at the time of the founding, as the *Skoien* panel opinion did. The academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is "inconclusive at best," *Skoien*, 2010 WL 2735747, at *11 (Sykes, J., dissenting), and we refrain now from making a determination based on contradictory views. Instead, as we must, we follow the en banc majority's holding that some categorical bans on firearm possession are constitutional. *Id.* at *3 (majority opinion); *see also United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). For purposes of Williams's case, this means that if he falls within one of the categorical bans, the Second Amendment does not apply to him, assuming, of course, that the ban satisfies "some form of strong showing." *Skoien*, 2010 WL 2735747, at *3. One such categorical ban is on firearm possession by a convicted felon. *See McDonald*, 2010 WL 2555188, at *25 (plurality opinion); *Heller*, 128 S. Ct. 2816-17. And because Williams is a convicted felon, the ban applies to him.

But the government does not get a free pass simply because Congress has established a "categorical ban"; it still must prove that the ban is constitutional, a mandate

that flows from *Heller* itself. *Heller* referred to felon disarmament bans only as "presumptively lawful," which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper. And to determine whether the presumption of lawfulness gives way in this case, we must apply *Skoien*'s "strong showing" requirement to § 922(g)(1) as that statute was applied in this case. In *Skoien* we declined to adopt a level of scrutiny applicable to every disarmament challenge, although we hinted that it might look like what some courts have called intermediate scrutiny. Consequently, for purposes of Williams's challenge to § 922(g)(1) as it applies to him, we can examine his claim using the intermediate scrutiny framework without determining that it would be the precise test applicable to all challenges to gun restrictions.

To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective. *Cf. Skoien*, 2010 WL 2735747, at *3. We find that the government satisfies its burden. In this case, the government's stated objective is to keep firearms out of the hands of violent felons, who the government believes are often those most likely to misuse firearms. *See*, Note, *Selective Incapacitation: Reducing Crime Through Predictions of Recidivism*, 96 Harv. L. Rev. 511, 515 & n.24

(1982) (noting a study that found that felons convicted of robbery were among those most likely to commit future crimes); *see also Skoien*, 2010 WL2735747, at *3 ("Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court."); *cf. Landers v. State*, 299 S.E.2d 707, 709-10 (Ga. 1983) ("[T]he General Assembly sought to keep guns out of the hands of those individuals who by their prior conduct had demonstrated that they may not possess a firearm without being a threat to society."). We cannot say that this objective is not an important one. *Cf. Skoien*, 2010 WL2735747, at *3 ("[N]o one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective.").

We next must determine whether § 922(g)(1) is substantially related to this objective in Williams's case. The government attempts to show a substantial relationship between its objective of preventing felons access to guns and § 922(g)(1) by pointing to Williams's own violent past. The government's evidence passes constitutional muster.

Williams was convicted of felony robbery. In Indiana, where Williams's conviction occurred, robbery is violent by definition. *See United States v. Lewis*, 405 F.3d 511, 514 (7th Cir. 2005). In fact, Williams's specific crime involved his beating the victim so badly that the victim required sixty-five stitches. (App. at 29.) The fact that Williams was convicted of a violent felony defeats any claim he has that § 922(g)(1) is not substantially

related to preventing him from committing further violence.

And although we recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent, that is not the case for Williams. Even if the government may face a difficult burden of proving § 922(g)(1)'s "strong showing" in future cases, it certainly satisfies its burden in this case, where Williams challenges § 922(g)(1) as it was applied to him. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."). Williams, as a violent felon, is not the ideal candidate to challenge the constitutionality of § 922(g)(1).

We are further guided in our determination by the fact that every court to address the constitutionality of § 922(g)(1) in light of *Heller* has upheld that statute. *See United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010) (per curiam); *Vongxay*, 594 F.3d at 1114-18; *United States v. Khami*, 362 F. App'x. 501, 507-08 (6th Cir. 2010) (unpublished); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010); *United States v. Stuckey*, 317 F. App'x 48, 50 (2d Cir. 2009) (per curiam); *United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009), *cert. denied*, 129 S. Ct. 2814 (2009); *United States v. Brunson*, 292 F. App'x 259, 261 (4th Cir. 2008) (per curiam) (unpublished); *United States v. Irish*, 285

F. App'x 326, 327 (8th Cir. 2008) (per curiam) (unpub-
lished).

Because Williams was convicted of a violent felony, his
claim that § 922(g)(1) unconstitutionally infringes on his
right to possess a firearm is without merit. We also
note that our en banc decision in *Skoien* considered and
disposed of an issue similar to Williams's equal protec-
tion argument, so we need not address it further. 2010
WL 2735747, at *6 ("True, the statute tolerates different
outcomes for persons convicted in different states, but
this is true of all situations in which a firearms
disability . . . depends on state law.").

### C. Title 18 U.S.C. § 3553(a)'s Sentencing Factors

Williams finally argues that the district court erred in
applying the 18 U.S.C. § 3553(a) factors because the
court failed to consider his non-frivolous sentencing
arguments. We review a sentence for both procedural
and substantive reasonableness under an abuse of discre-
tion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

In this case, because Williams raises only a procedural
argument, we need not consider the substantive reason-
ableness of his sentence. *Cf. United States v. Farris*, 532
F.3d 615, 620 (7th Cir. 2008) (declining to address the
procedural argument when defendant raised only the
substantive argument). A sentence is procedurally unrea-
sonable when a trial court fails to give meaningful consid-
eration to a defendant's non-frivolous sentencing argu-
ments. *United States v. Cunningham*, 429 F.3d 673, 679
(7th Cir. 2005).

Williams contends that the district court erred by failing to address specifically his argument that he should receive a reduced sentence because of the crack-to-powder sentencing disparity. *See Spears v. United States*, 129 S. Ct. 840, 843-44 (2009). But the district court did address Williams's argument; it simply reached a conclusion with which Williams disagreed. Williams's primary evidence at sentencing was his contention that the Department of Justice generally acquiesces to variances in crack sentences when the defendant is not violent, is not a recidivist, and does not possess a firearm. The court responded to this argument, however, noting first that the Justice Department's position did not reflect the current state of the law. (App. at 28.) The court further determined that certain mitigating factors—namely, a non-violent history, a first-time offender status, and the absence of gun possession—were nonexistent in this case. (*Id.* at 29, 32, 33.) Therefore, the court concluded that Williams was undeserving of a sentencing variance.

We think that this explanation was sufficient. It is evident from the record that the district court listened to the arguments and considered the evidence and the defendant's personal circumstances. *See Rita v. United States*, 551 U.S. 338, 357-59 (2007). Because this explanation demonstrated the court's basis for its reasons, it matters little that the explanation was brief. *Id*. We therefore reject Williams's sentencing argument.

### III. Conclusion

For the foregoing reasons, Williams's conviction and sentence are AFFIRMED.