**STATE of Minnesota, Respondent,**

v.

**Andrew Anthony CRAIG, Appellant.**

No. A10–1938.

Supreme Court of Minnesota.

Feb. 27, 2013.

Lori Swanson, Attorney General and John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, Saint Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, G. Tony Atwal, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Andrew Anthony Craig was found guilty by a Ramsey County jury of possessing a firearm as an ineligible person, in violation of Minn.Stat. § 624.713, subd. 1(2) (2012). After trial, Craig moved to vacate his conviction on the basis that the statute, as applied to him, violated the Second Amendment to the United States Constitution. The district court denied the motion and entered judgment of conviction. The court of appeals upheld the statute as constitutional and affirmed Craig's conviction. Because we conclude that application of section 624.713, subdivision 1(2) to Craig does not violate the Second Amendment as historically understood, we affirm his conviction, but do so on different grounds.

In the early morning hours of September 10, 2009, Mounds View police responded to a 911 call regarding a domestic disturbance at a local apartment complex. A third party reported that a woman, later identified as S.Y., was running through the hallways and screaming for someone to call the police. As police officers responded, they received information that a maroon car with Minnesota license plates had left the scene. Further, officers learned that the driver of the vehicle was the male suspect involved in the domestic incident and that the suspect normally carried a gun in his waistband.

While following the maroon car, officers noticed that the driver was moving around the inside of the vehicle. At one point, the driver leaned over toward the passenger seat so far that one officer lost sight of the driver's head. The officers stopped the car and confirmed that the driver was Craig. A search of the car revealed that Craig's backpack located on the front passenger seat contained a loaded .22–caliber revolver. Subsequently, Craig was charged with one count of possession of a firearm by an ineligible person, in violation of Minn.Stat. § 624.713, subd. 1(2).

At trial, the State produced evidence consistent with the facts described above. Additionally, Craig testified that he had a prior felony conviction of fifth-degree controlled substance offense, in violation of Minn.Stat. § 152.025, subd. 2(1) (2008). Craig's sentence for that conviction was stayed and he was placed on supervised probation for three years.

On the charge that Craig possessed a firearm as an ineligible person, the jury found Craig guilty. Craig then filed a post-trial motion to vacate his conviction, arguing that the ineligible-person statute violated his Second Amendment right to keep and bear arms as recognized by the United States Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. City of Chicago,* — U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). The district court denied the motion, entered judgment of conviction, and imposed the mandatory minimum sentence of 60 months imprisonment.

The court of appeals affirmed. *State v. Craig,* 807 N.W.2d 453 (Minn.App.2011). In doing so, the court applied intermediate scrutiny and reasoned that banning violent felons like Craig from owning guns was substantially related to the State's impor-tant interest in protecting public safety. *Id.* at 461–64.

## I.

Craig argues that Minn.Stat. § 624.713, subd. 1(2) (the "ineligible-person statute"), which prohibits a person previously convicted of a "crime of violence" from possessing a firearm, infringes upon his Second Amendment right to keep and bear arms. He contends that strict scrutiny applies to his claim because the Second Amendment right is a fundamental right. Additionally, he asserts that the ineligible-person statute fails strict scrutiny because there is no evidence that his predicate felony conviction was of a crime of violence.

■■■ We review a constitutional challenge to a statute de novo. *In re Individual 35W Bridge Litig.,* 806 N.W.2d 820, 829 (Minn.2011). We "presume statutes to be constitutional and exercise the power to declare a statute unconstitutional with extreme caution and only when absolutely necessary." *Id.* (citation omitted) (internal quotation marks omitted). As a result, we uphold a statute unless the challenging party demonstrates that the statute is unconstitutional beyond a reasonable doubt. *State v. Yang,* 774 N.W.2d 539, 552 (Minn. 2009).

Whether the ineligible-person statute violates the Second Amendment is a question of first impression for our court. To answer that question, we will first review the text of the Second Amendment and relevant federal case law, and then apply that law to the facts of this case.

## A.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

infringed." U.S. Const. amend. II.[1] Recently, the United States Supreme Court examined the scope of the Second Amendment right in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. City of Chicago*, —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

In *Heller*, the Supreme Court reviewed the constitutionality of a complete prohibition on the possession of handguns in the home. 554 U.S. at 573, 128 S.Ct. 2783. Heller brought an action to enjoin the District of Columbia from enforcing the handgun ban. *Id.* at 575–76, 128 S.Ct. 2783. The Court struck down the ban and held that the Second Amendment guarantees an individual right to keep and bear arms unconditioned on service in a militia. *Id.* at 595, 128 S.Ct. 2783. In doing so, the Court not only interpreted the text of the Second Amendment, but also examined relevant historical materials to confirm the meaning of the text as understood at the time of the Second Amendment's ratification. *Id.* at 576–626, 128 S.Ct. 2783. Those relevant historical materials included analogous state constitutional provisions, pre- and post-civil war case law and legislation, and the work of several commentators from St. George Tucker's version of Blackstone's Commentaries to Thomas Cooley. *Id.* The Court concluded that, at its "core," the Second Amendment protects the rights of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 630, 635, 128 S.Ct. 2783.

Two years later in *McDonald*, the Supreme Court considered whether the Second Amendment right to keep and bear arms for the purpose of self-defense applied to state and local governments. 130 S.Ct. at 3026. Several petitioners sued the City of Chicago seeking a declaration that

its handgun ban violated the Second and Fourteenth Amendments. *Id.* at 3027. The Court held that the Second Amendment right recognized in *Heller* is incorporated under the Fourteenth Amendment's Due Process Clause, making that right "fully applicable to the States." *Id.* at 3026, 3036–44 (plurality opinion). The Court determined the right is "fundamental to [the American] scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 3036, 3042 (plurality opinion) (citations omitted) (internal quotation marks omitted). The Court also concluded that the right was "to be enforced against the States" under the "same standards that protect" the right "against federal encroachment." *Id.* at 3035 (citation omitted) (internal quotation marks omitted).

Thus, the Second Amendment protects the rights of law-abiding, responsible citizens to possess a handgun in the home for the purpose of self-defense, and is fully applicable to the State of Minnesota. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783; *McDonald*, 130 S.Ct. at 3026. But the right secured by the Second Amendment is "not unlimited." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783; *accord McDonald*, 130 S.Ct. at 3047 (plurality opinion). Specifically, the right to possess a firearm does not extend to "any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Indeed, the Supreme Court in *Heller* expressly stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws

1. The Minnesota Constitution does not confer a similar right to keep and bear arms.

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27, 128 S.Ct. 2783 (emphasis added); *accord McDonald,* 130 S.Ct. at 3047 (plurality opinion) ("We repeat those assurances here."). The Court described the above-quoted statement as a list of "presumptively lawful regulatory measures." *Heller,* 554 U.S. at 627 n. 26, 128 S.Ct. 2783. Moreover, the Court indicated that, if confronted with a constitutional challenge to its list of presumptively lawful exceptions to the Second Amendment, there would "be time enough to expound upon the historical justifications for the exceptions [it] mentioned if and when those exceptions [came] before [it]." *Id.* at 635, 128 S.Ct. 2783.

Craig argues that *Heller*'s determination that longstanding prohibitions on the possession of firearms by felons (generally referred to as "felon-dispossession statutes") are presumptively lawful is dicta, and not binding on our court. Several federal circuit courts have considered similar arguments and rejected them. *See, e.g., United States v. Vongxay,* 594 F.3d 1111, 1115 (9th Cir.2010) (noting that *Heller*'s listing of presumptively lawful exceptions limited the scope of the Second Amendment right and therefore was "integral" to the Supreme Court's holding); *United States v. Barton,* 633 F.3d 168, 171–72 (3d Cir.2011) (reasoning that *Heller*'s provision of presumptively lawful regulatory measures was "outcome determinative" because the Court's holding was made conditional on the ground that Heller was "not *disqualified* from the exercise of Second Amendment rights" (em-

phasis added) (citations omitted) (internal quotation marks omitted)). It is not necessary for us to resolve whether *Heller*'s determination that felon-dispossession statutes are presumptively lawful is dicta or binding authority, and we decline to do so. Instead, we conclude *Heller*'s determination is well-reasoned and persuasive authority that we elect to follow. Consequently, we conclude that felon-dispossession statutes, like the ineligible-person statute at issue here, are presumptively lawful.

### B.

We next consider the scope of the Second Amendment's protection to determine how to analyze the constitutionality of the ineligible-person statute. Neither *Heller* nor *McDonald* definitively addresses that issue. But recent federal circuit court opinions have determined whether the comparable federal statute, 18 U.S.C. § 922(g)(1) (2006) (the "felon-in-possession statute"),[2] violates the Second Amendment. *See United States v. Torres–Rosario,* 658 F.3d 110, 113 n. 1 (1st Cir.2011) (collecting cases). Generally, to make that determination, federal circuit courts have examined whether the felon-in-possession statute burdens a category of persons protected by the Second Amendment; and specifically, whether felons fall within or outside the scope of the Second Amendment's protection. *See United States v. Williams,* 616 F.3d 685, 692 (7th Cir.2010) (stating that the "threshold inquiry is whether [the felon] is qualified to possess a firearm in the first instance"). If felons fall within the scope of the Second Amendment's protection, then they are entitled to exercise the right to possess a firearm as secured by the Second Amendment. *See*

**2.** The federal felon-in-possession statute provides: "It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. 18 U.S.C. § 922(g)(1).

*Heller,* 554 U.S. at 595, 626–27, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3026, 3047 (plurality opinion). But if felons fall outside that scope, then they are categorically excluded from exercising the right to possess a firearm and may not assert a Second Amendment challenge against a statute dispossessing them of that right. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L.Rev. 1443, 1449 (2009).[3]

The federal circuit courts have considered both facial and as-applied challenges to the felon-in-possession statute. All federal circuit courts that have considered facial challenges have rejected them, concluding that a felon retains no Second Amendment right to possess a firearm. *See United States v. Torres–Rosario,* 658 F.3d 110, 112–13 (1st Cir.2011); *United States v. Stuckey,* 317 Fed.Appx. 48, 50 (2d Cir.2009); *United States v. Barton,* 633 F.3d 168, 172 (3d Cir.2011); *United States v. Moore,* 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Anderson,* 559 F.3d 348, 352 (5th Cir.2009); *United States v. Khami,* 362 Fed.Appx. 501, 507–08 (6th Cir.2010); *United States v. Irish,* 285 Fed. Appx. 326, 327 (8th Cir.2008); *United States v. Vongxay,* 594 F.3d 1111, 1114–15 (9th Cir.2010); *United States v. McCane,* 573 F.3d 1037, 1047 (10th Cir.2009); *United States v. Rozier,* 598 F.3d 768, 770–71 (11th Cir.2010). These courts reasoned that *Heller*'s list of presumptively lawful exceptions establishes persons or activities that categorically fall outside the scope of

the Second Amendment's protection. *Moore,* 666 F.3d at 318 (citing *United States v. Marzzarella,* 614 F.3d 85, 91 (3d Cir.2010) (reasoning that restrictions listed in *Heller* are presumptively lawful "because they regulate conduct outside the scope of the Second Amendment")). And because felons are included on *Heller*'s list of exceptions, they are categorically unprotected by the Second Amendment against a statute that restricts their right to possess a firearm. *Id.*

Four federal circuit courts have considered whether the felon-in-possession statute violates the Second Amendment, not as applied to all felons, but rather as applied to particular felons. *See Moore,* 666 F.3d at 319; *Torres–Rosario,* 658 F.3d at 113; *Barton,* 633 F.3d at 173; *Williams,* 616 F.3d at 692. Generally, these courts concluded that to successfully challenge the felon-in-possession statute as applied, a felon must present specific facts that distinguish his or her conviction from the convictions of other felons who are categorically unprotected by the Second Amendment. *See Barton,* 633 F.3d at 174. But these courts utilized three different approaches to determine whether a particular felon has presented distinguishing facts.

In *Barton,* the Third Circuit determined that the relevant inquiry under *Heller* was whether particular types of felons were unprotected by the Second Amendment as understood at the time of the Second Amendment's ratification. 633 F.3d at 174. Based upon its review of the relevant historical materials, the court concluded

---

**3.** This initial scope inquiry parallels First Amendment analysis. *See United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (addressing as a preliminary issue whether the disputed speech is protected or unprotected). And *Heller* consistently compared the Second Amendment to the First. *See, e.g.,* 554 U.S. at 635, 128 S.Ct.

2783 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different.").

that felons convicted of violent crimes were categorically excluded from protection under the Second Amendment. *Id.* at 173–74. Applying that conclusion, the court rejected Barton's as-applied challenge because he presented no facts distinguishing his conviction from the convictions of other violent felons. *Id.* at 174.

The First and Fourth Circuits adopted a different approach. They examined whether the defendant was a law-abiding, responsible citizen under the Second Amendment to determine whether a particular felon has presented facts distinguishing his or her conviction from the convictions of other categorically unprotected felons. *See Moore,* 666 F.3d at 319–20 (rejecting a felon's claim that he was carrying the firearm for protection when his criminal history, consisting of three prior felony convictions of robbery and assault, rendered him the opposite of the law-abiding citizen the Second Amendment protects); *Torres–Rosario,* 658 F.3d at 113 (rejecting a felon's claim that his two prior drug convictions were nonviolent because "drug dealing is notoriously linked to violence").

In *Williams,* the Seventh Circuit declined to apply the Third Circuit's approach on the ground that the academic writing regarding the historical understanding of the Second Amendment is "inconclusive at best." 616 F.3d at 692 (citation omitted) (internal quotation marks omitted). Instead, the court concluded that Williams, as a felon, fell within a categorical ban under *Heller,* and therefore the Second Amendment did not apply

to him if the ban itself was constitutional. *Id.* To determine whether the government's ban survived constitutional review, the court applied intermediate-like scrutiny. *Id.* The court concluded that the government had met its burden because the government's interest in keeping "firearms out of the hands of violent felons" was important, Williams's prior felony robbery conviction was violent, and taking away Williams's right to possess a firearm was substantially related to the government's important interest. *Id.* at 692–94.

We conclude that the historical approach applied by the Third Circuit in *Barton* is most faithful to the Supreme Court's analysis in *Heller* and *McDonald,* and therefore we adopt that approach. *See Heller,* 554 U.S. at 635, 128 S.Ct. 2783 (indicating the Supreme Court would similarly "expound upon the historical justifications for the exceptions [it] mentioned"); *McDonald,* 130 S.Ct. at 3047 (reiterating that the scope of the Second Amendment is defined by historical inquiry).[4] Consequently, we must determine whether Craig has presented facts distinguishing his conviction from the convictions of other felons who are categorically unprotected by the Second Amendment as historically understood. To answer that question, we must first examine the Second Amendment as understood at the time of its ratification to determine which types of convictions placed a felon outside the scope of the Second Amendment's protection. Then, we must determine whether Craig's conviction is distinguishable from those types of convictions.

---

4. Several federal circuit courts have similarly adopted this historical approach when determining whether other types of regulations are excluded from the scope of the Second Amendment's protection. *See, e.g., United States v. Greeno,* 679 F.3d 510, 518–21 (6th Cir.2012) (upholding sentencing enhancement for possessing a firearm during a drug offense, U.S.S.G. § 2D1.1(b)(1)); *United States v. Bena,* 664 F.3d 1180, 1182–85 (8th Cir. 2011) (upholding ban on possessing a firearm for those subject to a court order for protection, 18 U.S.C. § 922(g)(8)); *United States v. Rene E.,* 583 F.3d 8, 12–16 (1st Cir.2009) (upholding federal ban on juvenile possession of handguns, 18 U.S.C. § 922(x)(2)(A)).

## C.

Generally, felon-dispossession laws are not that longstanding. As *Heller* noted, state bans on carrying concealed weapons are firmly rooted in 19th-century case law. 554 U.S. at 626, 128 S.Ct. 2783. But complete bans on the possession of firearms are largely creatures of the 20th century. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 707 (2009). The first state felon-dispossession statute was not enacted until 1897 in New York. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009) (citing Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty–Fifth Annual Meeting 862–63 (1925)). And the federal version was not enacted until 1938, 147 years after the Second Amendment was ratified. Federal Firearms Act, ch. 850, § 2(f), 52 Stat. 1251 (1938). At that point, the federal ban only encompassed those convicted of a "crime of violence," defined then as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," and other forms of aggravated assault. *Id.* §§ 1(b), 2(f), 52 Stat. at 1250–51. It did not bar nonviolent felons from possessing firearms until 1961. An Act to Strengthen the Federal Firearms Act, Pub.L. No. 87–342, 75 Stat. 757 (1961). Indeed, Minnesota's ineligible-person statute was not on the books until 1975. Act of June 4, 1975, ch. 378, §§ 1–3, 1975 Minn. Laws 1278, 1278–81.

But the recent enactment of felon-dispossession statutes does not undermine their validity. *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir.2010) (reasoning that "exclusions need not mirror limits that were on the books in 1791"). The more appropriate inquiry is whether the Second Amendment, as historically understood, would permit such a restriction on the right to possess a firearm, regardless of whether those laws existed at the time of the Second Amendment's ratification. *United States v. Greeno*, 679 F.3d 510, 519 (6th Cir.2012) (stating that "[n]othing in *Heller* suggests such a static reading of the Second Amendment"). By listing certain longstanding prohibitions as presumptively lawful, *Heller* tells us that "statutory prohibitions on the possession of weapons by some persons are proper ... leaving to the people's elected representatives" the task of sorting out the details. *Skoien*, 614 F.3d at 640.

Commentators agree that the Framers understood the Second Amendment right was tied to the concept of a "virtuous" citizenry, and considered excluded from the Second Amendment's scope persons who were likely to commit violent offenses. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 492 (2004) (arguing that "[h]istorians have long recognized that the Second Amendment was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue"); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986) (stating that "the ultimate expression of civic *virtu* was [a citizen's] defensive use of arms against criminals" and that "the right to arms does not preclude laws disarming the unvirtuous citizens (i.e.criminals)").

Moreover, proposals from constitutional ratifying conventions, which *Heller* characterized as "highly influential," 554 U.S. at 604, 128 S.Ct. 2783, reflect that the Framers thought those who posed danger to society—the "unvirtuous"—fell outside the scope of the Second Amendment's protection, *see* Stephen P. Halbrook, *The Right of the People or the Power of the State:*

*Bearing Arms, Arming Militias, and the Second Amendment*, 26 Val. U.L.Rev. 131, 142, 147, 185 (1991). Pennsylvania Anti–Federalists offered an amendment stating, " '[N]o law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.' " Marshall, *supra* at 712–13 (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971)). Samuel Adams in Massachusetts sought to invalidate laws that would " 'prevent the people of the United States, who are peaceable citizens, from keeping their own arms.' " *Id.* at 713 (quoting Schwartz, *supra* at 674–75). And New Hampshire delegates proposed a provision that " 'Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion.' " *Id.* at 713 (quoting Schwartz, *supra* at 761).[5]

■ We conclude that the scope of the Second Amendment's protection as historically understood did not extend to felons convicted of a crime of violence because those individuals were traditionally disqualified from possessing a firearm.[6] Here, Craig has failed to establish that his felony conviction of fifth-degree possession of a controlled substance is sufficiently distinguishable from the convictions of felons categorically unprotected

by the Second Amendment as historically understood. Several reasons support our conclusion.

First, Craig's predicate felony conviction of fifth-degree possession of a controlled substance is defined by statute as a "crime of violence." Minn.Stat. § 624.712, subd. 5 (2012). And a substantial nexus exists between drugs and violence, and that nexus renders a prior felony drug offender more dangerous than a typical law-abiding citizen. *Barton*, 633 F.3d at 174; *see also Torres–Rosario*, 658 F.3d at 113 (rejecting an as-applied challenge because "drug dealing is notoriously linked to violence" and noting that, even if the Supreme Court finds "some felonies so tame and technical as to be insufficient to justify the ban, drug dealing is not likely to be among them"); *United States v. Bustos–Torres*, 396 F.3d 935, 943 (8th Cir.2005) (reasoning that "weapons and violence are frequently associated with drug transactions"); *United States v. Dean*, 59 F.3d 1479, 1490 n. 20 (5th Cir.1995) (observing that "firearms are the tools of the trade of those engaged in illegal drug activity").

Second, felons convicted of a crime of violence are more likely to reoffend and commit further crimes of violence that threaten the public safety. *See United States v. Yancey*, 621 F.3d 681, 685 (7th

---

5. Not all commentators interpret the historical record to justify disqualifying nonviolent felons from possessing firearms. *See* Marshall, *supra* at 712–13; Larson, *supra* at 1374–75. But even these commentators concede that the Framers would have considered a firearm ban on violent felons consistent with the Second Amendment. *See* Marshall, *supra* at 698, 728 ("Rather, actual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger.").

6. We observe that the federal felon-in-possession statute, which encompasses both violent and nonviolent felonies, has consistently withstood Second Amendment challenges. *See, e.g., Moore*, 666 F.3d at 319; *Torres–Rosario*, 658 F.3d at 113; *Barton*, 633 F.3d at 172; *Williams*, 616 F.3d at 692. Minnesota's ineligible-person statute, however, extends only to crimes of violence. *Compare* Minn.Stat. § 624.713, subd. 1(2) *with* 18 U.S.C. § 922(g)(1). Thus, the issue of whether the Second Amendment right extends to a person who is not a felon convicted of a crime of violence is not presently before us, and we decline to reach that issue.

Cir.2010) (recognizing that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use"); *Barton*, 633 F.3d at 175 (concluding it is well established that "felons are more likely to commit violent crimes than are other law-abiding citizens") (citing Bureau of Justice Statistics, Recidivism of Prisoners Released in 1994, at 6 (2002) (reporting that among 234,358 federal inmates released in 1994, the arrest rates for homicides were 53 times the national average)).

Craig relies on *Heller* to argue that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635, 128 S.Ct. 2783. But the language upon which Craig relies assumes that the individual exercising the right to possess a firearm is a "law-abiding, responsible" citizen. *Id.* A felony conviction of a crime of violence renders the felon the opposite of the law-abiding, responsible citizen who can assert a Second Amendment right. *See Moore*, 666 F.3d at 319; *Barton*, 633 F.3d at 174. Because Craig has been convicted of a crime of violence, he is not the type of law-abiding citizen who retains the right to possess a handgun in the home for the purpose of self-defense.

Accordingly, Craig has failed to present facts distinguishing his conviction from the convictions of other felons who are categorically unprotected by the Second Amendment as historically understood. The Second Amendment as understood at the time of its ratification excluded those convicted of crimes of violence from exercising the right to possess a firearm. Craig was convicted of a felony offense categorized as a crime of violence by statute, and that categorization is firmly rooted in the historical understanding of the Second Amendment. Therefore, we con-clude that Craig is categorically unprotected by the Second Amendment and Minnesota's ineligible-person statute is constitutional as applied to him.

## II.

Having concluded that Craig is categorically unprotected by the Second Amendment, it is not necessary to further address whether the ineligible-person statute survives a specific level of scrutiny—intermediate, strict, or otherwise. We only scrutinize Craig's claim under the Second Amendment if we conclude that Craig is protected by the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir.2011) (reasoning that if a restriction "regulates [a person] falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment ... then the analysis can stop there; the regulated [person] is categorically unprotected, and the law is not subject to further Second Amendment review"). Those courts that have taken this next step and reviewed firearm restrictions under a level of scrutiny do so only for limitations *not* identified in *Heller* as "presumptively lawful." *See, e.g., United States v. Chester*, 628 F.3d 673, 683 (4th Cir.2010) (applying intermediate scrutiny to ban on domestic-violence misdemeanants, 18 U.S.C. § 922(g)(8)); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir.2010) (applying intermediate scrutiny to ban on those subject to domestic protection order, 18 U.S.C. § 922(g)(9)); *Marzzarella*, 614 F.3d at 97–98 (applying intermediate scrutiny to ban on the possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k)). Because we do not adopt an applicable level of scrutiny, we hold that the court of appeals erred in doing so and vacate the court's determination in that regard.

### III.

In summary, we conclude that Minn. Stat. § 624.713, subd. 1(2), which prohibits a person previously convicted of a "crime of violence" from possessing a firearm, does not violate the Second Amendment as applied to Craig, who has a prior felony conviction of fifth-degree possession of a controlled substance.

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.